CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

AUG 0 9 2010

JULIA C. DUDLEY, CLERK
BY: K. Bauseman
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| MICHAEL H. DUNN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 5:09-CV-00085 |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| DEPUTY H. B. VANMETER, ) | |
| d/b/a Frederick County VA Sherriff's Office, ) | By: Hon. Glen E. Conrad |
| ) | Chief United States District Judge |
| Defendant. ) | |

The plaintiff, proceeding pro se, filed this action against Deputy H. B. Van Meter, alleging that the defendant used constitutionally excessive force while arresting the plaintiff pursuant to a valid warrant. This case is now before the court on the defendant's motion for summary judgment. For the reasons set forth below, the defendant's motion will be granted.

**Factual Background**

For purposes of summary judgment, the facts are presented in the light most favorable to the non-moving party.[1] Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

At approximately 3:39 p.m. on October 21, 2007, Deputy Van Meter ("Van Meter" or the "defendant") arrived at 184 Chapel Road, Middletown, Virginia, in order to serve and execute a

---

[1] Deputy Van Meter offers a quite different version of the facts. Van Meter states that, upon his arrival at the property, Dunn gave his name but refused to give any other information. When Van Meter told him that he had a warrant for his arrest, Dunn began arguing that Raymond West, his brother-in-law, should be arrested instead. After several minutes of conversation, Van Meter claims that he told Dunn to stand up and turn around so that he could apply handcuffs and arrest him. Van Meter then claims that Dunn stood up and begun running toward the storm door on the side of his house, without telling Van Meter where he was going. Van Meter then claims that he radioed for backup and then grabbed Dunn's arm in order to prevent him from entering his house, and then accidentally fell on top of Dunn as Dunn lunged away from him. As they fell, Dunn's head struck the concrete step at the bottom of the door. As Van Meter attempted to cuff Dunn, commanding Dunn to stop resisting, Dunn continued to struggle. After Van Meter was able to handcuff Dunn's right arm, he used a "pain compliance" technique to apply pressure to Dunn's left thumb, enabling Van Meter to cuff his arm. (Def.'s Br. at 2-4).

valid arrest warrant for assault and battery on Michael H. Dunn ("Dunn" or the "plaintiff"). Van Meter was the only officer on the scene. After exiting his patrol car and approaching the property, Van Meter observed Dunn sitting in front of the house and asked him his name. When Dunn responded, Van Meter asked him for his social security number in order to verify his identity. Dunn did not respond to this request, however, and instead asked Van Meter whether he had come to talk to Dunn about several trespassing notices that Dunn had procured a few days earlier.[2] Dunn does not dispute that Van Meter may have told him that he was executing an arrest warrant on Dunn; Dunn merely asserts that, "[i]f deputy Vanmeter said I'm under arrest and put my hands behind my back I did not here him [sic]." (Notations on Criminal Complaint at 1).[3]

After a few moments of discussion, Dunn turned away from Van Meter and began walking into the carport of his house, towards his kitchen door. Dunn asserts that he intended to enter his house in order to retrieve copies of the trespassing notices in order to show them to Van Meter. Dunn walked ten to twelve feet toward the door and reached his hand toward the handle of the storm door. As his hand touched the door, Van Meter grabbed Dunn from behind and twisted his arm behind his back. Dunn then claims that Van Meter slammed Dunn's head into the

---

[2]The precise nature of these notices is unclear. It appears, however, that Dunn in October 2007 served his brother-in-law, Raymond West, with a notice forbidding him to come onto Dunn's property. West then swore out the warrant against Dunn for assault and battery which Van Meter executed on October 21. The warrant appears to have been subsequently dismissed as groundless.

[3]Plaintiff's pro se filings are largely in the form of "notations" handwritten in the margins of previous court documents and copies of the defendant's filings. This particular document was appended to the plaintiff's complaint, and is a copy of a state court criminal complaint made out against the plaintiff on a state law charge of resisting arrest. In his response to the defendant's motion for summary judgment, the plaintiff noted generally for the court to consider all of the documents he had previously filed.

panel of the door while also ramming his knee into the left side of Dunn's body.[4]

After being struck by Van Meter, Dunn fell to the ground, with Van Meter on top of him. Despite Van Meter's repeated commands for Dunn to stop resisting, it is undisputed that Dunn struggled to free himself from Van Meter as Van Meter attempted to place him in handcuffs. Dunn claims that he was attempting to free himself only because he feared further injury from Van Meter. Eventually, Van Meter was able to handcuff first one of Dunn's arms, and then the other. As Dunn explicitly conceded several times during argument on the motion before the court, all of the injuries to his head, neck, and ribs occurred as Van Meter was wresting him away from the kitchen door—before Dunn was lying on the ground or placed in handcuffs.

After Dunn was handcuffed, Van Meter transported Dunn to the patrol car, allegedly twisting Dunn's thumb painfully en route. Once in the patrol car, Dunn complained to Van Meter that his head hurt, that he had chest pain, and that his ribs were broken. Van Meter observed only small facial cuts and abrasions, but nonetheless called Middletown Rescue Squad, the local emergency medical unit. Dunn, however, refused to allow the Squad to examine him, and refused its offer to transport him to Winchester Medical Center. After the Rescue Squad left, Van Meter transported Dunn to jail, where pictures were taken of the plaintiff revealing small cuts and abrasions.

The day after the incident, Dunn appeared at the Martinsburg VA Medical Center, where he was treated for mild facial abrasions. A chest x-ray revealed three broken ribs on his left side.

---

[4]Because it is difficult to determine with clarity from the allegations of Dunn's pro se complaint the precise timing of the alleged injuries, the court made explicit inquiries of Dunn at the oral hearing upon the defendant's summary judgment motion for the purpose of clearing up the ambiguity. In response to the court's repeated inquiries, Dunn expressly and uniformly indicated that Van Meter struck his ribs at the same time that Dunn's head was allegedly rammed into the door—i.e., prior to being subdued and handcuffed.

(Def.'s Ex. A at 1, 4-5). Dunn was discharged with medication.

Subsequently, Dunn was charged in state court with resisting arrest in relation to this incident and was convicted in a jury trial.

## Procedural History

The plaintiff filed this pro se action in the Western District of Virginia on October 20, 2009, alleging, in substance, a claim of excessive force under 42 U.S.C. § 1983 and a state law false imprisonment claim. (Compl. at 1). The defendant filed a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), which the court granted as to the false imprisonment claim but denied as to the excessive force claim in a memorandum opinion dated December 17, 2009.[5]

On July 12, 2010, the defendant filed a motion for summary judgment, supported by affidavits from his superior officers, claiming that he is entitled to qualified immunity. The plaintiff responded on August 2, 2010 with a letter that repeated the factual allegations of his complaint and gave notice of two witnesses he intended on calling, but did not include any affidavits to support his claim.[6] The court heard arguments from both parties on the defendant's

---

[5]The plaintiff's false imprisonment claim was dismissed because it failed to allege that the process pursuant to which he was imprisoned was not lawful.

[6]The court notes that the defendant's failure to provide any affidavits supporting the allegations in his complaint likely contravenes Federal Rule of Civil Procedure 56(e), which mandates that the non-moving party may not "merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion." Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Inasmuch as Dunn is proceeding pro se, however, the court is reluctant to dismiss the case on this basis, even though there is some suggestion that it is within the court's discretion to do so. See Haines v. Kerner, 404 U.S. 519 (1972) (holding that the court must liberally construe the pleadings of a *pro se* plaintiff). But see Brown v. Crawford, 906 F.2d 667, 670 (11th Cir. 1990) (upholding a grant of summary judgment when the pro se plaintiff did not submit any medical evidence to rebut the defendants' explanation of allegedly unconstitutional jail conditions); Franklin v. Murphy, 745 F.2d 1221, 1235 (9th Cir. 1984) (noting that, to avoid summary judgment, a pro se plaintiff may not rely solely on the allegations in his pleadings, but must present some "significant probative evidence tending to support the complaint.").

motion for summary judgment on August 5, 2010.

## Standard of Review

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.1994).

A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, however, the burden shifts to the nonmoving party to show that such an issue does, in fact, exist. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The nonmoving party must set forth more than a "mere . . . scintilla of evidence" to forestall summary judgment. Anderson, 477 U.S. at 252. Thus, "unsupported speculation . . . is not sufficient to defeat a summary judgment motion." Ash v. United Parcel Service, Inc., 800 F.2d 409, 411-412 (4th Cir. 1986).

## Discussion

Determining whether public officers are entitled to qualified immunity involves two steps of analysis. First, the court must consider whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show [that] the officer's conduct violated a

5

constitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated," even when the facts are viewed in the best light for the injured plaintiff, the plaintiff cannot prevail. Id. Where the alleged facts have shown a constitutional violation, the defendant officer will still be shielded from all liability under the doctrine of qualified immunity if the constitutional right alleged to have been violated was not "clearly established" at the time of the incident. Id.

Therefore, in order for Dunn to defeat the defendant's motion for summary judgment, he must have stated a violation of a constitutional right, and that right must have been clearly established on October 21, 2007—the time he suffered his injuries. See Jones v. Buchanan, 325 F. 3d 520, 526 (4th Cir. 2003).

A.

Although the court is not barred from considering the latter of the Saucier steps before the former, see Pearson v. Callahan, 129 S. Ct. 808, 818 (2009), it considers the viability of the Fourth Amendment allegations first.

Given that an arrest by a law enforcement officer constitutes a "seizure" under the Fourth Amendment, a plaintiff demonstrates a violation of the Fourth Amendment only where the officer's use of force in making the seizure was not objectively reasonable, given the circumstances of the arrest. Graham v. Connor, 490 U.S. 386, 395 (1989); Jones, 325 F. 3d at 527. This standard mandates "a careful balancing" of Fourth Amendment rights "against the countervailing governmental interests at stake." Id. at 396. Because the officer's use of force must be only objectively reasonable, his subjective intentions are irrelevant to the issue of whether a constitutional violation has occurred. Martin v. Gentile, 849 F.2d 863, 869 (4th Cir.

1988). Furthermore, due to the fact that police officers are often forced to make split-second decisions regarding their use of force against a given suspect, the court must consider the facts "from the perspective of a reasonable officer on the scene," and must be careful not to apply the "20/20 vision of hindsight" to the officer's decision. Jones, 325 F. 3d at 527 (4th Cir. 2003) (citing Graham, 490 U.S. at 396). Thus, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" violates the Fourth Amendment. Graham, 490 U.S. at 396.

Determining whether a "reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force" requires a fact-specific analysis of the particular circumstances of the case at hand. Graham, 490 U.S. at 396-97. Under Graham, the factors to consider when determining whether a given use of force was excessive include the "severity of the crime at issue," whether the suspect poses an "immediate threat to the safety of the officers or others," and whether the suspect is "actively resisting arrest or attempting to evade arrest by flight." Id. at 396. The Fourth Circuit has also indicated that a consideration of the extent of the plaintiff's injury may be relevant in determining whether an officer's particular use of force was reasonable. See Jones, 325 F.3d at 527. But see Wilson v. Flynn, 429 F.3d 465, 468 (4th Cir. 2005) (mentioning only the Graham factors).

Even when construing the allegations in the manner most favorable to Dunn, the Graham factors do not cut in his favor. Dunn alleges, in essence, two instances in which Van Meter used excessive force in conducting his arrest: (1) slamming Dunn's head into the storm door and striking Dunn's ribs while attempting to subdue him, and (2) painfully twisting Dunn's thumb while leading him to the patrol car. Because it is possible that one of the instances may have been

7

justified while the other one was not, these two allegations will be analyzed separately. See Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005).

The court finds that there was no Fourth Amendment violation with regard to Van Meter's use of force while attempting to subdue Dunn. To the extent that it is relevant under the precedent of the Fourth Circuit to discuss the extent of the plaintiff's injuries in connection with this analysis, see Jones, 325 F.3d at 527, this factor is inconclusive. The fact that Dunn suffered three broken ribs tends to support his claim that the force used against his left side was excessive. All of the medical reports indicate that his facial abrasions, however, were relatively minor (Def.'s Ex. A at 4); thus, the force used in connection with Dunn's head hitting the door is less likely to have been excessive.

The three Graham factors, for their part, each cut against Dunn's position. With respect to the first Graham factor, Dunn was being arrested pursuant to a valid warrant for assault and battery. Van Meter therefore had probable cause at the time of the incident to believe that Dunn had committed a past crime of violence, even though the warrant against Dunn appears to have been later dismissed. See Wilson, 429 F.3d at 468 (stressing, while holding that the manner of plaintiff's arrest was reasonable, that the plaintiff's assault involved "criminal activity," even though it "did not result in any significant physical harm."). Certainly, there is a much greater interest in executing the arrest warrant in this case than in detaining persons who have committed minor property crimes or who have committed no crime at all. See Jones, 325 F.3d at 527 (finding that the plaintiff had stated a claim for excessive force when the plaintiff was punched in the face after he voluntarily sought assistance at the Sheriff's office and was not suspected of any crime); Rowland v. Perry, 41 F.3d 167 (4th Cir.1994) (finding that the plaintiff had stated a claim

of excessive force where the officer tackled the unarmed plaintiff after seeing him pick up a $5 bill that did not belong to him). Given that the state interest in executing valid arrest warrants is not minor, the use of some measure of force to detain Dunn is more likely to be reasonable in this case than in cases in which the state interest in detention is extremely low. See ids. Thus, this factor does not assist Dunn.

The second Graham factor also cuts against Dunn, because a reasonable police officer could have believed that Dunn's conduct posed a threat to the arresting officer. It is clear under Graham that "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." Brown v. Gilmore, 278 F.3d 362, 369 (4th Cir. 2002) (citing Saucier, 533 U.S. at 205). Van Meter was operating without backup as the sole officer on the scene in his attempt to arrest Dunn for suspected assault and battery. Dunn does not dispute that Van Meter may have told Dunn that he was under arrest. Nor does he dispute that he turned and attempted to enter his house through his kitchen door instead of accompanying Van Meter to the patrol car. Nor does he indicate at any point that he ever told Van Meter that he was entering the house only to procure the trespass notices. Under these circumstances, a reasonable police officer could have concluded that Dunn, a suspect in a case of battery, had ignored Van Meter's statement that he was under arrest and was entering the house in order to procure a weapon or otherwise prevent execution of the warrant.

Nor is the third Graham factor helpful to Dunn, because it is clear even according to Dunn's allegations that he was resisting arrest. Dunn admits that, even if he was told that he was under arrest, he walked several yards away from Van Meter and attempted to enter his house.

Dunn also admits that he continued struggling while Van Meter was attempting to handcuff him on the ground. At the very least, both of these acts could reasonably be construed by the arresting officer as conduct resisting or evading arrest. See Wilson, 429 F.3d at 468 (finding that the plaintiff had resisted arrest because "even assuming the officer never [told Wilson that he was under arrest], Wilson still disobeyed Officer Flynn's orders and physically resisted when Officer Flynn attempted to put Wilson in handcuffs."). Dunn's subjective belief that his struggling was necessary to stave off injury is not relevant to the issue of whether Van Meter reasonably believed that he was resisting arrest. This factor, therefore, does not weigh in Dunn's favor, either.

As Dunn has admitted, all of the injuries to his head, ribs, and neck were sustained in the few brief moments after he attempted to open his kitchen door and before Van Meter was able to subdue him in handcuffs. There is no evidence that Van Meter used any additional force on Dunn while he was on the ground or after Dunn stopped resisting arrest; Dunn alleges only that the injuries to his head, ribs, and neck occurred at the moment that Van Meter tackled Dunn, ramming his head into the door and striking his left side with his knee. As explained above, the Graham factors suggest that Van Meter could have reasonably believed that some degree of force was necessary to restrain Dunn from entering his house and evading arrest. Furthermore, the fact that Van Meter stopped using force immediately after Dunn was restrained suggests that the force used by Van Meter was only that which was necessary to effect Dunn's arrest. See id. at 469 ("Wilson does not allege that the officers used any improper force after restraining him; this fact distinguishes Wilson's case from many in which we have held the plaintiff has alleged an excessive force claim."). See also Kane v. Hargis, 987 F.2d 1005 (4th Cir.1993) (finding that the

plaintiff had stated a claim for excessive force where the plaintiff alleged that the officer first secured her and then smashed her face into the ground multiple times). For these reasons, the court finds that the force used by Van Meter to restrain Dunn prior to handcuffing him did not violate the Fourth Amendment.

The court also finds that there was no Fourth Amendment violation with regard to Van Meter's alleged twisting of Dunn's thumb while he was being led to the patrol car. Even though Dunn had already been handcuffed at the time of the alleged injury, Van Meter's actions are still viewed through the lens of the Fourth Amendment. See Gilmore, 278 F.3d at 369 (applying the Fourth Amendment to the plaintiff's allegations that the arresting officer had been excessive when dragging her to his patrol car after handcuffing her).

Here, too, the Graham factors do not favor Dunn. For the reasons stated above, the first Graham factor counsels in favor of Van Meter. The second and third Graham factors are more favorable toward Dunn with regard to this instance, because Dunn has alleged that Van Meter twisted his thumb after Dunn had already been handcuffed and had ceased to resist arrest. As has been noted, however, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." Brown, 278 F.3d at 369. In Brown, the Fourth Circuit held that it was reasonable for the arresting officers to mistakenly believe that a suspect who had already disobeyed a direct order from the officers would "balk at being arrested." Id. Thus, held the Court, it was reasonable for the officers to handcuff the suspect and drag her to their patrol car, reasoning that "[f]or courts to fine-tune the amount of force used in a situation such as this would undercut the necessary element of judgment inherent in a constable's attempts to control a volatile chain of events." Id.

11

In this case, Dunn had already attempted to enter his house when confronted with an arrest warrant and had struggled and resisted before Van Meter was able to cuff him. Van Meter thus could have been reasonably mistaken that Dunn would continue to pose a safety threat or resist during the short trip to the patrol car.

Finally, Dunn has not alleged any injury to his thumb other than the momentary pain at the time of the incident. He does not appear to have requested any medical treatment relating to the injury to his thumb at any later period, nor does he allege any lasting consequences to his thumb from this incident. See Brown, 278 F.3d at 369 (describing the dragging of the plaintiff to the patrol car as a "minimal level of force"). Under Fourth Circuit precedent, this lack of any significant injury to his thumb counsels in favor of a finding that the force used by Van Meter was not unreasonable under the Fourth Amendment. See Jones, 325 F.3d at 527.

Because it is apparent that a reasonable officer in Van Meter's position could have thought that the amount of force applied by Van Meter to Dunn was necessary under the circumstances, Van Meter's conduct in twisting Dunn's thumb did not violate the Fourth Amendment.

B.

The court further finds that, even if Dunn's allegations do support a finding that Van Meter's conduct amounted to a constitutional violation, he would be entitled to qualified immunity both with regard to his alleged tackling of Dunn and his twisting of Dunn's thumb, because any Fourth Amendment violation alleged by Dunn was not "clearly established" prior to the time of the incident.

Qualified immunity is a complete bar to a plaintiff's recovery against the defendant on a

42 U.S.C. § 1983 claim for excessive force under the Fourth Amendment. A government official is entitled to qualified immunity if his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, qualified immunity shields an officer from liability when he reasonably, even if mistakenly, believes that his conduct complies with the law. Pearson v. Callahan, 129 S. Ct. 808, 823 (2009). The doctrine protects an officer from liability regardless of whether his mistake was a mistake of law or a mistake of fact. Id. at 815.

A violation is "clearly established" if caselaw prior to the officer's conduct has placed the official on notice that his conduct constitutes a violation. "While a decision directly on point is not required to put officials on notice of a 'clearly established' right, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Melgar ex rel. Melgar v. Greene, 593 F.3d 348, 358 (4th Cir. 2010) (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987).

In this case, even if Van Meter was erroneous in believing that his conduct did not constitute excessive force under the Fourth Amendment, his mistake was reasonable. As explained above, Graham mandates that the reasonableness of an officer's actions be judged in consideration of the severity of the crime, the potential for an immediate safety threat, and the suspect's resistance to or compliance with the arresting officer. Graham, 490 U.S. at 396. The court is not aware of any caselaw prior to 2007 that would purport to clarify the Graham analysis to hold Van Meter's conduct in this case unconstitutional. On the contrary, there is some indication that the forcible tackling of resisting subjects was tacitly approved in certain circumstances by pre-2007 courts. See e.g., Lyons v. City of Xenia, 417 F.3d 565, 578 (6th Cir.

13

2005) (holding that an officer was entitled to qualified immunity when he tackled a woman involved in a verbal domestic disturbance).

Simply put, it is not at all clear that it violates the Fourth Amendment for a lone officer who is executing a valid arrest warrant to grasp, tackle, and strike the suspect in the side while the suspect is resisting arrest and attempting to enter his home. Any reasonable officer would have believed, under Graham, that the circumstances of this case warranted the exertion of some degree of force in order to restrain Dunn: he was being arrested on a warrant for assault and battery, had turned away from the officer in an attempt to re-enter his home, and continued resisting after Van Meter began to grapple with him. It appears that no caselaw prior to 2007 had "clearly established" that it was improper to tackle and strike the side of a suspect in these circumstances. See Wilson, 429 F.3d at 469 (finding no Fourth Amendment violation when officers allegedly punched and kicked a resisting suspect, slamming his face into a fireplace screen). Thus, it was not unreasonable for Van Meter to believe that his conduct was consistent with the Fourth Amendment.

Likewise, Van Meter's twisting of Dunn's thumb was not clearly unconstitutional at the time of the incident, given the Fourth Circuit's prior holding in Brown that dragging a woman to the patrol car was not excessive when she had previously refused to comply with the officers' instructions. Brown, 278 F.3d at 369. Given this precedent, it was reasonable for Van Meter to believe that propelling a previously-resisting suspect toward a patrol car by twisting his thumb in a manner that left no significant injury was not constitutionally excessive. See Tatum v. City and County of San Francisco, 441 F.3d 1090, 1096-97 (9th Cir. 2006) (holding it objectively reasonable for an officer to use a control hold on a suspect who was resisting arrest in order to

14

place him in handcuffs).

The doctrine of qualified immunity, therefore, shields Van Meter from liability in both instances for which Dunn has alleged an excessive use of force. Van Meter was entitled to exert some measure of force in preventing Dunn from entering his home, even when that force included tackling Dunn in such a way that Dunn's head struck against the door, and administering some blows in order to place Dunn in handcuffs. Likewise, Van Meter cannot be liable for allegedly applying a minimal amount of force to Dunn's thumb in order to propel him to the patrol car.

## Conclusion

For the foregoing reasons, the court will grant the motion for summary judgment filed by Van Meter.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this memorandum opinion and the accompanying order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 9th day of August, 2010.

*[signature]*
Chief United States District Judge